# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 9, 2012

## PATRICK POPE v. STATE OF TENNESSEE

### Appeal from the Circuit Court for Maury County
### No. 16944      Robert L. Jones, Judge

### No. M2011-02380-CCA-R3-PC - Filed December 19, 2012

The petitioner, Patrick Pope, appeals the Maury County Circuit Court's denial of his petition for post-conviction relief. The petitioner is currently serving an effective eleven-year sentence for aggravated burglary, aggravated assault, and aggravated robbery. On appeal, he contends that he was denied his right to the effective assistance of counsel at trial. Specifically, he contends that trial counsel was ineffective by failing to investigate possible alibi witnesses in preparing the case for trial. Following review of the record, we affirm the denial of post-conviction relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Stanley K. Pierchoski (on post-conviction), Memphis, Tennessee; Rhonda Hooks-Kendricks (at trial and direct appeal), Columbia, Tennessee, for the appellant, Patrick Pope.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Mike Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History and Factual Background

The facts underlying the petitioner's multiple convictions, as recited on direct appeal, are as follows:

> On July 28, 2006, Shirley and Hugh Hazard were asleep in their

bedroom located at 216 Gardendale in Columbia, Tennessee. Mrs. Hazard had fallen asleep in her bedroom chair and awoke to hear a "racket" in the kitchen. The sounds that she heard led her to believe that someone was in their home. Mr. Hazard was bedridden and relied on a wheelchair to move around, as well as oxygen that was supplied by a machine that was located in the hallway outside their bedroom.

Mrs. Hazard continued to hear noises and sat up "half dozed" as two men appeared in her bedroom. She was not wearing her glasses but could see that the two men had what appeared to be t-shirts tied around their faces. The men were also wearing shorts and tennis shoes. Both of the men had guns. Mrs. Hazard described the men as one being "bigger" with "a tattoo on his belly" that looked like "vines growing" or "wiggly-looking things."

The men demanded money, guns, and drugs. Mrs. Hazard assured the men that they "didn't have any" but told the men, "if you can find it, you can have it." The larger man kept the gun in one hand and had what appeared to be a sock on his other hand. He used the sock to pull open drawers and wipe down surfaces after he touched them. The larger man was the one who looked through the house, while the other man "stood back and watched."

The larger man asked where the phone was located and pulled the cord out of the wall with his foot. The larger man told Mrs. Hazard that they were going to take her car. He demanded to know where the keys were located. Mrs. Hazard told him where the keys were located. After the man with the tattoo found the keys, he made sure they were the right keys. Mrs. Hazard confirmed that he had found the correct keys, and the man put them in his pocket.

. . . .

The men left the bedroom, and Mrs. Hazard could hear the oxygen machine switch to "on." One of the men told them that he was "turning it back on." Soon after that she heard the men leave. Mrs. Hazard looked out of the window to see the men driving away in her car, a green Saturn. Mrs. Hazard ran next-door and called her son.

In addition to the car, the men took Mrs. Hazard's purse, a billfold, a cell phone, a Uniden wall phone, a camera, and various prescription medications. Mrs. Hazard was unable to identify [the petitioner] as the man

with the tattoo. Mr. Hazard died approximately two-and-a-half weeks after the incident.

Officer John Ussery of the Columbia Police Department responded to a call at 7:22 a.m. on July 26, 2006, at the Hazard residence on Gardendale. After talking with the victims, Officer Ussery was able to determine that the suspects had entered the home through a rear window to a sunroom. The screen had been removed. Officer Ussery described the condition of the house as ransacked.

Officer Scott Knudsen received a "be on the lookout for" a green Saturn on the morning of July 26, 2006. Officer Knudsen located a car matching that description in the yard of 606 West Fourth Street. Outside the vehicle he noticed two dark-complected, African-American men. One of the men had tattoos on his stomach. The men were between five feet seven inches and six feet tall. The men were gone by the time that he confirmed that this was the missing car. Officer Knudsen received permission from the owner of the residence for consent to search the property. A Uniden telephone was found in a trash can near the car and a green Gatorade bottle was found inside the car in the center console. Mrs. Hazard had told police a bottle of lemon-lime Gatorade had been taken from her refrigerator. Officer Knudsen could not identify [the petitioner] as one of the men standing near the car. Officer Knudsen secured the scene and the car was eventually dusted for fingerprints.

A few days after the incident, [the petitioner], also known as "Patman" or "Pacman," and Darius Hawkins were developed as persons of interest. Mr. Hawkins came into the police department for an interview accompanied by his mother. Mr. Hawkins gave a very detailed statement that he and [the petitioner] were involved in the incident. The police attempted to get [the petitioner] to come in for an interview. He agreed to come into the office but never showed up. After juvenile petitions were taken out against [the petitioner], he turned himself in and requested an attorney.

. . . .

At trial, Darius Hawkins testified against [the petitioner]. According to Mr. Hawkins, the two men spent the night at Mr. Hawkins's mother's house on the night of the incident. They left the house around 2:00 or 3:00 a.m. and started walking. [The petitioner] gave Mr. Hawkins a .25 caliber semiautomatic pistol before they left the house. [The petitioner] was carrying

a .380 semiautomatic pistol. Mr. Hawkins stated the conversations was about "pulling a lick" or "going to do a robbery." [The petitioner] had the idea for the activity.

Just before dawn, the men randomly chose to burglarize the victims' home. They took a screen off of a window and went inside the house. Mr. Hawkins stated that they started searching for "some money, or something" inside the house when they heard a noise. When Mr. Hawkins turned around, [the petitioner] was gone. Mr. Hawkins exited the house through the window and met [the petitioner] walking up the street. They agreed to return to the house to "do it this time."

The men again entered the house through the window in the sunroom. They had their pistols in their hands and had tied their t-shirts around their faces. Mr. Hawkins testified that he and [the petitioner] entered a bedroom and "seen [sic] two old people in the bed." According to Mr. Hawkins, he stayed in the bedroom while [the petitioner] searched the rest of the house. Mr. Hawkins tried to "keep [the victims] calm." [The petitioner] had a sock on his hand and used to it wipe down the things that he touched in order to avoid leaving fingerprints. At one point, [the petitioner] came back to the bedroom and told Mr. Hawkins to search the house.

[The petitioner] had a plastic bag full of "pill bottles" and a bottle of Gatorade from the refrigerator. [The petitioner] asked the victims where to find the car keys. [The petitioner] also unplugged a cordless phone and took it with him. The two men left in the car that belonged to the victims. [The petitioner] was the driver. Mr. Hawkins took a purse from the house that contained a billfold. The men drove the car to an address on West Fourth Street where [the petitioner] threw the pill bottles and "a little pouch" in the trash. [The petitioner] also threw away the cordless phone.

. . . .

Mr. Hawkins and [the petitioner] saw the police approaching and ran to [the petitioner's] house. When the police drove by, Mr. Hawkins was standing by the trunk of the car, and [the petitioner] was standing near the trash can. At [the petitioner's] house, Mr. Hawkins gave the gun back to [the petitioner], and then the men went to sleep.

During the investigation, police obtained fingerprints from the stolen

-4-

vehicle and the point of entry at the home. They also collected DNA from the Gatorade bottle found in the vehicle. The DNA from the Gatorade bottle matched the DNA profile of [the petitioner]. The fingerprints on the passenger front door and door handle from the vehicle belonged to Mr. Hawkins. [The petitioner's] fingerprints were found on the outside window frame and window of the sunroom at the victims' residence.

*State v. Patrick Pope*, No. M2009-01473-CCA-R3-CD (Tenn. Crim. App., at Nashville, Aug. 25, 2010).

Based upon these actions, the petitioner was indicted by a Maury County grand jury for aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping. Following a jury trial, he was convicted on all charges and sentenced to an effective term of eleven years in the Department of Correction. The petitioner filed a motion for new trial, which was argued before the trial court. Afterwards, the court entered a judgment of acquittal on the conviction for aggravated kidnapping. The motion was otherwise denied, and the petitioner filed notice of appeal with this court. After review, this court affirmed the convictions and sentences as imposed.

Thereafter, the petitioner filed a timely pro se petition for post-conviction relief asserting that he was denied his right to the effective assistance of counsel. Following the appointment of counsel, an amended petition was filed. Specifically, the petitioner contended that: (1) trial counsel denied the petitioner the right to testify in his own defense; (2) trial counsel failed to interview and subpoena key defense witnesses; (3) trial counsel failed to adequately prepare for and cross-examine the State's witnesses; and (4) trial counsel failed to utilize a third party defense, that the petitioner was not involved in the crime. A hearing was held at which the petitioner and trial counsel both offered testimony.

The petitioner testified that he was incarcerated during the period pending trial, and he asserted that trial counsel visited him only three or four times during that period. The petitioner contended that he had informed trial counsel that "Main Thang" would testify that the petitioner was not with Mr. Hawkins when the crimes were committed. The petitioner did not know "Main Thang's" real name, but he supplied trial counsel with the names of other people who knew him and told her which apartments he lived in. He indicated that he asked trial counsel on multiple occasions to find this witness, but he saw no effort from trial counsel to locate him. According to the petitioner, trial counsel "brushed him off" and avoided the issue when he asked. On cross-examination, the petitioner acknowledged that he did not know where "Main Thang" currently was.

The petitioner also faulted trial counsel for failing to call any defense witnesses,

-5-

stating that it was the lawyer's job to find the witnesses. Moreover, he believed that she did not adequately cross-examine the State's witness regarding discrepancies between various reports, statements, and trial testimony. Most of the discrepancies centered around the petitioner's physical characteristics and his tattoo. The petitioner particularly faulted trial counsel for failing to damage the credibility of the victim. He acknowledged that trial counsel had in fact brought up various discrepancies, but he asserted that she did not fight "to her best ability."

The petitioner stated that, after he heard the State's evidence, he felt that he should testify in his own defense. He and trial counsel discussed this, and she informed him that if he testified, she would withdraw from the case. The petitioner acknowledged that he had told the trial court that the decision not to testify was voluntarily made by him, but, at the post-conviction hearing, he stated that it was not a voluntary decision because it was made under trial counsel's threat of withdrawal.

Trial counsel testified that she was retained by the petitioner's mother to represent him just prior to the transfer hearing in juvenile court. In contrast to the petitioner's testimony, trial counsel testified that she met with the petitioner several times while he was incarcerated. She stated that she was particularly concerned about the petitioner, as he was a juvenile, so she took "extra care" and spent more than one hundred and fifty hours of time preparing for the case. Trial counsel testified that she received discovery, provided it to the petitioner, and reviewed it with him.

Trial counsel emphatically testified that the petitioner had never informed her of a possible alibi witness named "Main Thang." In fact, trial counsel stated that she specifically asked the petitioner about an alibi at one point, and he was not able to supply her with one. Trial counsel also testified that she was well aware of the discrepancies in the police reports and trial testimony with regard to the description given of the perpetrators, particularly of the tattoo on the stomach. Trial counsel testified that she "rode the issue of the tattoo to the end" and also attempted to point out each discrepancy to the jury. She indicated that she believed that the victim was in fact an excellent witness for the defense because the victim indicated before the jury that the tattoo on the petitioner's stomach was not the one she had seen on the perpetrator. Trial counsel testified that she raised the issue of sloppy police work, pointed out multiple inconsistencies, and cross-examined each witness "hard." Nonetheless, she was simply unable to overcome the presence of the fingerprints at the crime scene, the presence of the petitioner's DNA in the victim's car, and the co-defendant's testimony that the petitioner was an active participant in the crime. However, trial counsel stated that, with the evidence against the petitioner, she did not believe that anything more could have been done.

Trial counsel testified that the issue of the petitioner testifying was a "big deal" that

involved multiple discussions with the petitioner, his mother, and stepfather. Trial counsel acknowledged that she informed the petitioner that she did not recommend that he testify based upon his demeanor, lack of maturity, and prior aggravated robbery. However, trial counsel made clear to the petitioner that it was his decision and reviewed the pros and cons of testifying with him. She stated that she did in fact threaten to withdraw as counsel for the petitioner at one point, but it was not a decision based on whether he chose to testify. Trial counsel indicated that the petitioner asked her if he said certain things on the stand if it would change the outcome of the case. She further indicated that he asked her to approach a possible witness who was willing to testify falsely to clear the petitioner of guilt. Trial counsel refused to be involved in the unethical act. At that point, she informed the petitioner that she could not ethically call him as a witness to establish an alibi which she knew to be false, as the petitioner had confessed his guilt to her previously. She informed him that if he insisted upon pursuing that path, then she would be forced to withdraw.

After hearing the evidence presented, the post-conviction court concluded that the petitioner was not entitled to relief and denied the petition. This timely appeal followed.

**Analysis**

On appeal, the petitioner contends that the trial court erred by not granting relief because the proof showed that trial counsel was ineffective by failing to investigate possible alibi witnesses. The petitioner alleges that by attempting to raise reasonable doubt that the petitioner was a perpetrator of the crime, trial counsel put forth "a defense at trial of alibi." Once that decision was made, the petitioner contends that trial counsel should have hired an investigator to identify and locate potential witnesses to support the defense. He further asserts that an "investigation by a qualified investigator would have either found ["Main Thang" or another witness] or offered proof that no such witness existed. Either way it was ineffective assistance of counsel to pursue an alibi defense and not utilize an investigator to properly develop it."

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of

-7-

fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 687-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice, in turn, requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

In denying relief, the post-conviction court noted in its oral findings "how well prepared and how effective" trial counsel was in significantly impeaching the principal witnesses for the State, even noting that she might have been able to establish reasonable doubt in the minds of the jurors absent the fingerprint and DNA evidence. The court noted that the petitioner's testimony that trial counsel failed to effectively cross-examine witnesses was "a gross misstatement of the truth, because she did adequately prepare for and conduct a vigorous cross-examination of critical State witnesses." The court also noted that there was no credible evidence that "even now, three years later, . . . that a person known as 'Main Thang' ever existed." The post-conviction court simply found no credible evidence to support the petitioner's claim of ineffective assistance of counsel.

First, we note that we disagree with the petitioner's contention that trial counsel pursued a defense of alibi in this case. The petitioner notes that the strategy undertaken was one attempting to establish reasonable doubt as to the petitioner's guilt. However, he appears to equate that with presenting a defense of alibi. The assumption that the two defenses are the same, however, is inaccurate. While the defense of alibi does involve establishing that a petitioner did not commit the crime, *i.e.*, reasonable doubt as to innocence, it specifically involves placing the person at another place when the crime was committed. That was not the defense pursued in this case. In fact, it would not have been a viable defense in this case for trial counsel to present, as the petitioner confessed his guilt to her. She was ethically prohibited from putting forth alibi testimony which she knew to be untrue.

Regardless of his characterization, the petitioner has failed to put forth evidence which preponderates against the post-conviction court's findings. His main contention on appeal is that trial counsel was ineffective for failing to employ an investigator to investigate "Main Thang" or other possible alibi witnesses. However, the petitioner himself failed to put forth any evidence, other than his own testimony, that "Main Thang" even existed. Furthermore, there is no evidence in the record supporting the existence of any unknown alibi witness. Regardless, while the petitioner testified that "Main Thang" could provide him with an alibi and that he informed trial counsel of this, trial counsel specifically testified that she had never

been told about his possible existence. Based upon its statement that the petitioner's "testimony was weak at best," it is clear that the post-conviction court accredited trial counsel's account. As has been noted multiple times, it is not the province of this court to reweigh or re-evaluate credibility determinations made by the trier of fact. *See Burns*, 6 S.W.3d at 461. Trial counsel cannot be faulted for finding a witness she was not made aware of.

Moreover, this court has continually held that in order to establish entitlement to post-conviction relief when making an allegation that trial counsel failed to discover, interview, or present witnesses in support of the defense, a petitioner must present such a witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The petitioner presented no witnesses other than himself at the hearing and readily acknowledged that he did not known where "Main Thang" was. Even absent the other above noted reasons for the denial, the post-conviction court could not assume what a possible witness's testimony would have been and, further, that it would have aided the petitioner's case. The petitioner has not established his ineffective assistance of counsel claim and is entitled to no relief.

**CONCLUSION**

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE